UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 13-01945 SJO (MRWx)     **DATE:** July 21, 2014

**TITLE:**     C. Ross Mossler v. Aetna Life Insurance Co.

========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                             Not Present
Courtroom Clerk                                              Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**          **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                                  Not Present

========================================================================
**PROCEEDINGS (in chambers): AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The instant case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). On March 19, 2013, Plaintiff C. Ross Mossler ("Plaintiff") filed a Complaint against Defendant Aetna Life Insurance Co. ("Defendant"). On December 2, 2013, Plaintiff and Defendant filed their Opening Briefs. (*See generally* Pl.'s Opening Br., ECF No. 21; Def.'s Opening Br., ECF No. 23.) On December 19, 2013, Plaintiff filed his Responding Brief and on December 23, 2013, Defendant filed its Responding Brief. (*See generally* Pl.'s Responding Br., ECF No. 28; Def.'s Responding Br., ECF No. 29.) As ERISA matters are tried on the pleadings, the Court found this matter suitable for disposition without oral argument and vacated the trial date set for January 14, 2014. (*See* Minute Order Vacating Trial Date, ECF No. 32.) Having carefully reviewed the administrative record and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[1] *See* Fed. R. Civ. P. 52. For the reasons discussed below, the Court enters judgment in favor of Plaintiff.

I.     FACTUAL AND PROCEDURAL BACKGROUND

   A.     The Policy

Defendant issued a long term disability ("LTD") policy (the "Policy") to City National Bank that became effective on January 1, 2005. (Admin. R. ("AR") 2, 47.) The Policy was amended on January 1, 2010, which changed the Policy's definitions of "total disability" and "own occupation,"

---

[1] The Court issues its decision in narrative form "because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations." *Garrison v. Aetna Life Ins. Co.*, 558 F. Supp. 2d 995, 996 n.1 (C.D. Cal. 2008). Any finding of fact that is more appropriately deemed a conclusion of law, or vice versa, is so deemed. *See id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 13-01945 SJO (MRWx)</u>          **DATE:** <u>July 21, 2014</u>

and included a definition of "substantial and material acts." (AR 50-57.) The amended Policy defines an individual's first twenty-four months of "total disability" under the "own occupation" standard as follows:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be totally disabled on any day if, as a result of a disease or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your **own occupation** and you are not working in your own occupation.

(AR 51 (some emphasis omitted).) The amended Policy defines "total disability" after the first twenty-first months of total disability under the "any occupation" standard as follows:

> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be totally disabled on any day if, as a result of a disease or injury, you are not able to engage with reasonable continuity in **any occupation** in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:
>
> • A reasonable distance or travel time from your residence in light of the commuting practices of your community; or
>
> • a distance or travel time equivalent to the distance or travel time you traveled to work before becoming disabled; or
>
> • the regional labor market, if you reside or resided prior to becoming disabled in a metropolitan area.

(AR 51 (emphasis added).)

The Policy defines "own occupation" as "[a]ny employment, business, trade or profession and the substantial and material acts of the occupation you were regularly performing for your employer when your period of disability began. Own Occupation is not necessarily limited to the specific job you performed for your employer." (AR 57 (emphasis omitted).)

The Policy defines "substantial and material acts" as "[t]he important tasks, functions and operations generally required by employers from those engaged in your own occupation and [sic] cannot be reasonably be omitted and modified." (AR 57 (emphasis omitted).) The Policy provides

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:  CV 13-01945 SJO (MRWx)          DATE: July 21, 2014

how Defendant procedurally analyzes whether a claimant can perform "substantial and material acts":

> In determining what 'substantial and material acts' are necessary to pursue your **own occupation**, we will first look at the specific duties required by your employer.  If you are unable to perform one or more of these duties with reasonable continuity, we will then determined whether those duties are customarily required of other employees engaged in your **own occupation**.  If any specific, material duties required of you by your employee differ from the material duties customarily required of other employees engaged in your **own occupation**, then we will not consider those duties in determining what 'substantial and material acts' are necessary to pursue your **own occupation**.

(AR 57 (emphasis in original).)

In order to qualify for LTD benefits, a claimant's total disability under the "own occupation" standard must last through a 180-day qualifying period during which no LTD benefits are payable. (AR 43, 705.)  The Policy places the burden of proving eligibility for LTD benefits on the claimant. (AR 52.)  The Policy provides, in pertinent part, that a claimant's disability ends on "[t]he date that [a claimant fails] to give proof that [the claimant is] still disabled."  (AR 52.)

      B.    <u>Plaintiff's Employment and LTD Claim</u>

Plaintiff was employed by City National Bank as a Senior Vice President/Leader of the Entertainment Group. (AR 190.)  Plaintiff's last day of employment with City National Bank was July 15, 2011.  (AR 190.)

On January 4, 2012, Plaintiff applied for LTD benefits from Defendant.  (AR 190-91.)  Plaintiff's application stated that he suffered "pain throughout the body that limits functioning including sitting, standing, [and] walking." (AR 190.)  Plaintiff listed a diagnosis of "fibromyalgia, myofascial pain syndrome, degenerative disease, [and] spinal stenosis." (AR 190.)  Plaintiff described his duties as "manag[ing] a relationship line team handling clients in the entertainment industry." (AR 190.)

Based on Plaintiff's claimed "own occupation" disability date of July 16, 2011, and the required 180-day qualifying period, his LTD benefits would have become payable starting on January 12, 2012, and would end on January 11, 2014.  (AR 51, 705.)  Thereafter, Plaintiff would only be entitled to LTD benefits if he was totally disabled under the "any occupation" standard. (AR 51, 705.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  **CV 13-01945 SJO (MRWx)**          DATE:  **July 21, 2014**

Defendant interviewed Plaintiff on February 3, 2012.  (AR 80.)  Plaintiff explained that his condition had slowly worsened over five years and that he was experiencing muscle spasms, pain, and severe anxiety.  (AR 80.)  Plaintiff also stated that he was having a hard time remembering details.  (AR 80.)  In his application for LTD benefits, Plaintiff provided reports from a number of doctors as well as the Social Security Administration ("SSA").  The Court summarizes these reports as well as subsequent addendums contained in the Administrative Record.

      i.      <u>Dr. Ezekial Fink</u>

Plaintiff was initially treated for pain by Dr. Ezekial Fink of the Neurological Pain Institute in January 2011.  (AR 269.)  Plaintiff's "Electromyography" and "Nerve Conduction Velocity" studies were normal on January 24, 2011.  (AR 269.)  Plaintiff received epidural steroid injections on February 7, 2011 (AR 276-78), which provided substantial relief for several weeks, as did Topamax (AR 279).  However, a nerve root block did not provide relief.  (AR 279.)  Thus, another epidural steroid injection was provided on April 11, 2011.  (AR 282-84.)  On January 24, 2011, Dr. Fink diagnosed Plaintiff with (1) lumbar radiculopathy; (2) possible central radiculopathy, and (3) osteoarthritis.  (AR 272, 274.)

      ii.      <u>Dr. Leon Robb</u>

Plaintiff started seeing pain management specialist Dr. Leon Robb in September 2011. (AR 320-22.)  In an undated letter containing Dr. Robb's February 15, 2012 office note, Dr. Robb diagnosed Plaintiff with (1) fibromyalgia, (2) spinal stenosis, and (3) degenerative joint disease. (AR 320-22.)  Dr. Robb explained that "the pain is distressing and often excruciating and horrible." (AR 321.)  Dr. Robb further explained that the pain "is worse with standing, walking, [and] sitting for prolonged periods of time," but "is actually relieved by walking briskly, jogging, and meditation." (AR 321.)

      iii.      <u>The Mayo Clinic</u>

In December 2011, Plaintiff was evaluated at the Mayo Clinic by several physicians.  (AR 327-28, 981.)  The Mayo Clinic's final diagnosis was as follows:  (1) fibromyalgia in the setting of complex medical issues; (2) anxiety; (3) degenerative joint disease at L4-L5 with moderate central stenosis; (4) history of inflammatory arthritis; (5) history of peripheral neuropathy; (6) iron deficient anemia; and (7) abnormal outside chest x-ray.  (AR 327.)  One major method created by the American College of Rheumatology ("ACR") for diagnosing fibromyalgia is testing 18 "trigger points" on the body by noting pain for each trigger point when pressed.  (AR 710.)  If a patient reports pain for at least 11 of 18 trigger points, this supports a diagnosis of fibromyalgia.  (AR 710.)  Alternatively, doctors look to other ACR criteria for diagnosing fibromyalgia, such as the "widespread pain index" and "symptom severity score."  (AR 345, 710)  On December 5, 2011, the Mayo Clinic noted that while Plaintiff only registered 3/18 trigger points for fibromyalgia, he met other ACR criteria to support a diagnosis of fibromyalgia, with a widespread pain index of 12/19 and a symptom severity

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 13-01945 SJO (MRWx)</u>          DATE: <u>July 21, 2014</u>

score of 9/12.  (AR 345.)  The Mayo Clinic also described Plaintiff's anxiety to be "significant" and "debilitating."  (AR 346.)

   iv. <u>Dr. Steven Tan</u>

Plaintiff's primary care physician is Dr. Steven Tan, a member of the American Board of Internal Medicine and the National Certification Committee for Acupuncture and Oriental Medicine.  (AR 976.)  During the LTD benefit application process, Defendant obtained records for thirty-two of Plaintiff's office visits with Dr. Tan between January 6, 2011, and February 28, 2012 (AR 353-416), and on January 10, 2012, Dr. Tan submitted an Attending Physician's Statement ("APS") to Defendant (AR 301-302.)  In the APS, Dr. Tan listed Plaintiff's primary diagnosis as fibromyalgia and his secondary diagnosis as spinal stenosis.  (AR 301.)  Dr. Tan indicated that Plaintiff's status had "regressed" and that Plaintiff had no ability to work.  (AR 302.)

In a letter dated January 13, 2012, Dr. Tan briefly summarized Plaintiff's history and diagnosis and explained that his prognosis is poor "given that most of these conditions are chronic in nature and that he has exhausted many appropriate therapies."  (AR 976.)  Dr. Tan also noted that Plaintiff "has been intolerant to or unresponsive to steroid injections, epidurals, Vicodin, Lyrica, Cymbalta, Norco, Flexeril and Soma."  (AR 976.)  Dr. Tan also noted that a "[p]hysical exam has documented greater than 11 of 18 fibromyalgia trigger points," satisfying the trigger point test.  (AR 976.)  Furthermore, Dr. Tan noted that Plaintiff "also tried physical therapy, acupuncture and trigger point injections."  (AR 976.)

On April 25, 2012, Dr. Tan wrote a letter to Defendant stating that Plaintiff was disabled and unable to work.  (AR 1614.)

   v. <u>Dr. Arash Horizon</u>

Plaintiff saw rheumatologist Dr. Arash Horizon beginning in January of 2010.  (AR 493, 716-80.)  On March 5, 2012, Dr. Horizon submitted an APS to Defendant that listed Plaintiff's primary diagnosis as fibromyalgia, his secondary diagnosis of undifferentiated connective tissue disorder, and his "other" diagnosis of gout.  (AR 417.)  The fibromyalgia diagnosis appears to be based on Plaintiff's 14/18 noted trigger points from an exam on January 19, 2012.  (AR 902.)  Unfortunately, while Dr. Horizon discussed the extent of Plaintiff's disability in the APS, his comments are somewhat ambiguous.  (AR 417-19.)  On the first page, Dr. Horizon stated that Plaintiff "**will need to be absent from work due to a disability** beginning" on July 7, 2011 and ending on "present," where the APS was signed on March 5, 2012.  (AR 417 (emphasis added).)  However, on the next page, Dr. Horizon indicated that Plaintiff could physically perform sedentary work but that Plaintiff suffered from fatigue, malaise, no stamina, joint swelling, poor memory, poor sleep, and that Plaintiff could only work four hours per day and three days per week.  (AR 418.)  Dr. Horizon also provided that Plaintiff was able to give supervision and work cooperatively with others in group

settings.  (AR 418.)  In the APS, Dr. Horizon estimated Plaintiff's "return to work" date to be December 30, 2012.  (AR 418.)  Plaintiff stopped seeing Dr. Horizon in March of 2012.  (AR 701.)

      vi.    <u>Dr. Daryl Lum</u>

Starting January 2011, Plaintiff saw Dr. Daryl Lum, a doctor of internal medicine at the Ronald Reagan UCLA Medical Center.  (AR 316-17, 483-87.)  On February 17, 2012, Dr. Lum completed an APS stating a primary diagnosis of fibromyalgia, a secondary diagnosis of spinal stenosis, and an "other" diagnosis of peripheral neuropathy.  (AR 316.)  The APS stated that Plaintiff experienced fatigue, confusion, and had difficulty driving for prolonged periods.  (AR 317.)  Dr .Lum further stated that Plaintiff's symptoms are "worsened by stress, worse later in day, [and he has] difficulty concentrating."  (AR 317.)  Dr. Lum described Plaintiff's status as "regressed" and that he had "difficulty sitting continuously."  (AR 317.)  Dr. Lum also noted that Plaintiff appeared to be motivated to return to work.  (AR 317.)  The APS concluded by stating that Plaintiff had no ability to work.  (AR 317.)

On April 30, 2012, Dr. Lum wrote a letter to Defendant stating that Plaintiff was disabled and unable to work.  (AR 713.)

      vii    <u>Dr. Wonil Lee</u>

After Plaintiff stopped seeing Dr. Horizon in March of 2012, he began seeing a new rheumatologist, Dr. Wonil Lee in April of 2012.  (AR 1611-13.)  In his initial letter on April 17, 2012, Dr. Lee noted that Plaintiff had 12/18 trigger points, and thus Dr. Lee agreed with Plaintiff's diagnosis of fibromyalgia.  (AR 1613.)  The letter also indicated that Plaintiff required a multi-disciplinary team of doctors in Los Angeles to continue to monitor his therapy and that Dr. Lee would be Plaintiff's fibromyalgia doctor.  (AR 1613.)

      viii.    <u>Social Security Disability Benefits</u>

On February 17, 2012, Plaintiff notified Defendant that Plaintiff had been awarded Social Security Disability ("SSD") benefits by the SSA.  (AR 85.)  Plaintiff also faxed a copy of the award letter to Defendant.  (AR 296-99.)

    C.    <u>Defendant Commissions a Focused Case of Plaintiff by Dr. Milt Gavlick</u>

On Defendant's request, Dr. Milt Gavlick, specializing in Occupational Medicine, began a Focused Case of Plaintiff.  (AR 699-702.)  Defendant provided Dr. Gavlick with 334 pages of records for his review.  (AR 700.)  Dr. Gavlick never personally examined Plaintiff.  Rather, he conducted peer-to-peer reviews with three of Plaintiff's treating physicians.  (AR 699-702.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 13-01945 SJO (MRWx)</u>          DATE:  <u>July 21, 2014</u>

On April 19, 2012, Dr. Gavlick spoke with Dr. Lum regarding Dr. Lum's opinion that Plaintiff had no ability to work.  (AR 701.)  Dr. Lum felt this was mainly due to Plaintiff's own complaints of pain, which seemed "more severe" than most fibromyalgia patients.  (AR 701.)  Dr. Lum described Plaintiff as ambulatory and able to sit in his office without assistance or perceived difficulties. (AR 701.)  Dr. Lum had no knowledge of Plaintiff's exercise habits or his other activities.  (AR 701.) Dr. Lum stated that Dr. Tan was most familiar with and responsible for treating Plaintiff's fibromyalgia so that all questions regarding functionality should be directed at Dr. Tan.  (AR 701.)

On April 19, 2012, Dr. Gavlick spoke with Dr. Tan regarding Dr. Tan's opinion that Plaintiff had no ability to work.  (AR 701.)  Dr. Tan stated that his opinion was based on Plaintiff's subjective complaints of both generalized fibromyalgia pain and his back and leg pain.  (AR 701.)

On April 24, 2012, Dr. Gavlick contacted Dr. Horizon.  According to Dr. Gavlick's summary of the conversation, Dr. Horizon explained that Plaintiff was no longer his patient because he and Plaintiff had a disagreement over Plaintiff's return to work date.  (AR 701.)  Dr. Horizon allegedly described Plaintiff as "litigious" and stated that he had to discontinue seeing Plaintiff when he could find no disease process that would allow him to continue to complete disability forms for Plaintiff. (AR 701.)  Dr. Horizon explained that an independent examination of Plaintiff would likely come to similar conclusions.  (AR 701.)

On April 24, 2012, Dr. Gavlick completed the Focused Case of Plaintiff.  (AR 699-702.) Dr. Gavlick stated that because fibromyalgia is a functional syndrome without objective findings, there was no basis for physician-directed work restrictions or limitations related to the diagnosis. (AR 700.)  Dr. Gavlick further stated that Plaintiff's records lacked any neuropsychological testing results that would support physician-directed work limitations based upon cognitive deficits. (AR 700.)  As to Plaintiff's lumbar spinal stenosis, Dr. Gavlick noted that it was the Mayo Clinic's impression that Plaintiff's spinal stenosis was to be unlikely significant since Plaintiff was capable of jogging three miles.  (AR 700.)  In addition, Dr. Gavlick noted that Plaintiff had not sought surgical intervention.  (AR 700.)  Dr. Gavlick concluded that the medical records did not support a finding that Plaintiff was unable to return to work full time because he did not meet the definition for "totally disabled" for his "sedentary" occupation.  (AR 701.)  Dr. Gavlick stated that his impression was "unlikely to change without new and conclusive medical objective evidence for impairment that would interfere with sedentary . . . work."  (AR 701.)

      D.    <u>Defendant's Denial of Plaintiff's Claim for LTD Benefits</u>

Relying on Dr. Gavlick's opinion, Defendant denied Plaintiff's claim for LTD benefits in a letter dated April 30, 2012.  (AR 705-11.)  The denial letter summarized Plaintiff's submitted medical reports.  (AR 705-11.)  The denial letter stated that Plaintiff has "a [s]elf-reported history of fibromyalgia and rheumatoid arthritis with no documentation to support that either of these diagnosis is supported by current documentation."  (AR 709.)  The letter noted that "[t]here is no objective evidence to support the need for any restrictions or limitation with regards to full time in

at least a sedentary physical demand level occupation."  (AR 709.)  The letter then characterized Plaintiff's occupation as a "sedentary occupation."  (AR 709-10.)  The denial letter further stated that because Plaintiff's fibromyalgia is "a functional syndrome without objective findings, there is no basis for [Plaintiff's] physician directed work restrictions or limitations . . . ."  (AR 708.)  The denial letter further described fibromyalgia as "generally in and of itself, not a disabling condition to persons with sedentary or light strength occupations."  (AR 710.)

Citing outdated Policy terms, Defendant also explained in the denial letter that when reviewing eligibility for LTD benefits, it must focus on whether Plaintiff has the ability to perform the material duties of his own occupation as a Senior Vice President/Team Leader of Entertainment for "any employer."  (AR 706.)  Defendant explained that the medical records and exam findings did not support a finding that Plaintiff was unable to perform the core elements of his own occupation for any employer as of July 16, 2011.  (AR 705.)

The denial letter also summarized the medical records from the Mayo Clinic and Dr. Horizon, Dr. Lum, Dr. Tan, Dr. Robb, and Dr. Fink.  (AR 706-09.)  The denial letter noted that despite Plaintiff's complaints of severe pain, there were no focal findings, was no need for surgery, no definitive diagnosis of rheumatoid arthritis, and MRI findings were minimal.  (AR 706.)  The letter stated that the physical exams did not show Plaintiff to have any rheumatologic deficits and the exam findings and blood work were within normal limits.  (AR 706.)  The letter also stated that Plaintiff had no documented joint swelling, synovitis, skin changes, eye complaints, and that his fibromyalgia trigger points were not noted.  (AR 706.)  The letter stated that there was no objective evidence to support the need for any restrictions or limitations with regards to Plaintiff's full-time occupation in at least a sedentary physical demand level occupation.  (AR 709.)

The letter noted that Plaintiff had been approved for SSD benefits but that Defendant's disability determination and the SSA's disability determination are made independently and are not always the same.  (AR 710.)  The letter further discussed Plaintiff's SSD award:

> The difference between our disability determination and the SSD determination may be driven by [SSA] regulations. . . . Or, it may be driven by the fact that we have information that is different from what SSA considered.  We have not been provided with the basis for the SSD determination, and the evidence that was relied on for the SSD determination had not been identified to us.  Therefore, even though you are receiving SSD benefits we are unable to give it significant weight in our determination . . . .

(AR 710.)  The letter invited Plaintiff to appeal.  (AR 710.)

\ \ \

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: <u>CV 13-01945 SJO (MRWx)</u>        DATE: <u>July 21, 2014</u>

  E. <u>Plaintiff's Appeal Is Denied</u>

On October 19, 2012, Plaintiff appealed the denial of his LTD claim. (AR 1376.) As part of this appeal, Plaintiff sent a 108-page letter (AR 1376-1487), his sworn declaration (AR 1488-96), medical records (AR 1498-1927), Plaintiff's SSD award letter (AR 2211-14), and medical, vocational, and medication literature (AR 1928-2209, 2216-2517). In addition to summaries of Plaintiff's conditions and medical records, the appeal letter included the following arguments: (1) Defendant failed to consider pain, fatigue, medication side effects, and mental clouding; (2) Defendant was judicially estopped from denying that Plaintiff was disabled based on his SSD award; (3) there were systematic errors of Defendant's vocational assessment; and (4) Plaintiff was disabled under the terms of the Policy was thus entitled to LTD benefits under the Policy. (AR 1376-1487.)

On October 23, 2012, Plaintiff sent Defendant the entire SSA file on Plaintiff's claim for SSD benefits. (AR 931-1374.) In the SSA's explanation for its disability determination, the SSA described Plaintiff's occupation as requiring him to "walk/stand 1 hr, sit 8 hrs, write/type/handle small objects 8 hrs . . . supervise[] 6 employees 40% of the time." (AR 1131.) The SSA concluded that since Plaintiff is "unable to perform [his prior relevant work] as he describes or as it is generally performed in the national economy, . . . [Medical-Vocational Rule 202.06] directs a decision of disabled . . . ." (AR 1131.)

In response to Plaintiff's appeal, Defendant obtained "physician reviews" by Dr. Robert Swotinsky, specializing in occupational medicine (AR 2796-806), and Dr. Lawrence Burstein, a psychologist (AR 2809-13). Neither doctor personally examined Plaintiff, but rather they relied on written records for their review. Both concluded that Plaintiff is not disabled for the reasons set forth below. (AR 2809-13, 2796-806.)

    i. <u>Dr. Robert Swotinsky</u>

On December 6, 2012, Dr. Swotinsky, specializing in occupational medicine, conducted an independent physician review of Plaintiff's file. (AR 2797-806.) Dr. Swotinsky described Plaintiff as a "former bank executive," and categorized his job as having "sedentary" physical requirements. (AR 2797.) However, Dr. Swotinsky noted Plaintiff's claim that he sometimes had to "stand for long periods of time at receptions and sometimes traveled for work." (AR 2797.) Dr. Swotinsky attempted to conduct a peer-to-peer review with Dr. Fink on three separate occasions (December 5-7, 2012), but Dr. Fink never returned his calls. (AR 2801.) In addition, Dr. Swotinsky attempted a peer-to-peer review with Dr. Horizon on December 5, 2012, and December 6, 2012, but each time was told Dr. Horizon was unavailable. (AR 2802.) Dr. Swotinsky then went through each one of Plaintiff's conditions and concluded that Plaintiff was not disabled. (AR 2802-06.) Based upon the provided documentation, Dr. Swotinsky determined that Plaintiff reported "physical symptoms for which there [was] no physiologic[al] basis."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| **CASE NO.:** <u>CV 13-01945 SJO (MRWx)</u> | **DATE:** <u>July 21, 2014</u> |

(AR 2805.) Dr. Swotinsky noted that if Plaintiff's limitations were based on mental illness, they were not demonstrated by the file reviewed. (AR 2805.)

        ii.        <u>Dr. Lawrence Burstein</u>

On December 19, 2012, Dr. Burstein, specializing in Psychology, conducted an independent physician review of Plaintiff's application. (AR 2809-13.) Dr. Burstein noted that there did not appear to be any documents from a mental health professional during the period under review, nor did Mossler's mental health appear to be the focus of treatment. (AR 2810.) Dr. Burstein noted that Plaintiff's mental status examination was not consistent with impairments in Plaintiff's psychological functioning. (AR 2812.) Dr. Burstein stated that while Dr. Tan's clinical notes "occasionally contain the words[] 'depression' and/or 'anxiety' among the diagnoses, . . . the very brief notes did not contain any findings that I could discern to support that Plaintiff was in any way impaired as a result of his change in mood." (AR 2811.) Dr. Burstein noted that Dr. Horizon indicated that Plaintiff's mental status, mood, and affect were normal. (AR 2811.) Dr. Burstein concluded that the submitted documentation did not support a functional impairment from a psychological perspective from January 12, 2012, through November 30, 2012. (AR 2812.)

        iii.        <u>Defendant Invites Dr. Horizon and Dr. Fink To Review Dr. Swotinsky and Dr. Burstein's Independent Reviews</u>

On January 7, 2013, Defendant informed both Dr. Horizon and Dr. Fink that Defendant was currently reviewing a claim for disability benefits for Plaintiff. (AR 2789-90.) Defendant explained that Dr. Swotinksy attempted to reach both of them but was unsuccessful. (AR 2789-90.) Defendant asked Dr. Horizon and Dr. Fink to review Dr. Swotinsky and Dr. Burstein's independent reviews and to respond within five calendar days if they disagreed with the conclusions. (AR 2789-90.) Dr. Horizon and Dr. Fink never responded to Defendant's request.

        iv.        <u>Denial Letter Upholding Decision</u>

On January 16, 2013, nine days after sending the request letter to Dr. Horizon and Dr. Fink, Defendant sent a two-page letter to Plaintiff stating that the original decision to deny Plaintiff's LTD claim had been upheld. (AR 2791-92.) After again citing to outdated Policy definitions and then providing a summary of Plaintiff's conditions, Defendant provided the following basis for its decision to uphold the denial:

> Based on our review of the information you provided . . . we have determined that there was a lack of medical evidence (i.e. progress notes documenting abnormal physical exam findings, abnormal diagnostic testing, behavioral observations, cognitive impairments in functioning, etc.) supporting a functional impairment that would have prevented [Plaintiff] from performing the material duties of his own

occupation as of January 12, 2012.  Therefore, the original decision to deny LTD benefits effective January 12, 2012, has been upheld.

(AR 2792.)  Defendant explained that before reaching its conclusion, it forwarded Plaintiff's file to Dr. Swotinksy and Dr. Burstein for further review.  (AR 2792.)  Defendant noted that Dr. Horizon and Dr. Fink never responded to Defendant's letter asking them to review Dr. Swotinsky and Dr. Burstein's independent reviews.  (AR 2792.)  In addition, Defendant explained why it did not give the SSD award significant weight:

> We understand that [Plaintiff] was approved [for SSD] benefits. [H]owever, our disability determination and the SSD determination are made independently and are not always the same.  The difference between our determination and the SSD determination may be driven by the [SSA] regulations.  For example, the SSA regulations require that certain disease/diagnosis or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits.  Or, it may be driven by the fact that we have information that is different from what the SSA considered.  Therefore, even though [Plaintiff] is receiving SSD benefits, we are unable to give significant weight in our determination, and we find that [Plaintiff is not] eligible for LTD benefits based on the plan definition as stated above.

(AR 2792.)  On March 19, 2013, Plaintiff filed a Complaint with this Court for declaratory relief for LTD benefits.  (*See generally* Compl., ECF No. 1.)

II.    DISCUSSION

Under Section 1132 of ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "[I]f the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

In the present case, the parties have stipulated that the *de novo* standard of review applies. (*See* Joint Stipulation, ECF No. 17.)  Thus, the Court will review Defendant's denial of LTD benefits *de novo* and will decide whether Plaintiff has met his burden of establishing total disability by the preponderance of the evidence.  *See Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 13-01945 SJO (MRWx)</u>          DATE: <u>July 21, 2014</u>

(N.D. Cal. 2011) ("In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period."); *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) ("The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." (internal quotation marks and citation omitted)).

The interpretation of terms in an ERISA plan is often crucial to determining whether a participant is eligible to benefits under an ERISA plan. *Firestone Tire & Rubber Co.*, 489 U.S. at 115. When interpreting ERISA insurance plans, such as the one involved here, uniform federal common law governs. *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990). Plan administrators must discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Moreover, under uniform federal law, courts are to interpret terms in ERISA plans "in an ordinary and popular sense" and are not to "artificially create ambiguity where none exists." *Evans*, 916 F.2d at 1441. "[W]hen disputes arise, courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (quotation and internal alterations omitted). Additionally, each provision of a plan should be interpreted consistently with the entire document, and if a plan is ambiguous, then the court can examine extrinsic evidence to determine the intent of the parties. *Id.* (internal citations omitted).

    A.    <u>Plaintiff Has Established Total Disability between July 16, 2011, and April 30, 2012</u>

The question before the court is whether Plaintiff has met his burden of proving that he was totally disabled from performing his "own occupation" during the 180-day qualifying period and during at least the first twenty-four months thereafter, from January 12, 2012, through January 11, 2014. (AR 59, 64.) For the following reasons, the Court finds that Plaintiff has met his burden of establishing total disability between July 16, 2011, and at least April 30, 2012. Accordingly, the Court finds that Defendant incorrectly denied Plaintiff's LTD claim.

        1.    <u>Medical Evidence of Plaintiff's Conditions</u>

Plaintiff claims to suffer from the following conditions: (1) fibromyalgia; (2) peripheral neuropathy; (3) myofacial pain syndrome; (4) spinal stenosis; (5) degenerative osteoarthritis; (6) degenerative disc disease; (7) radiculopathy; (8) polyarticular gout; (9) anxiety; and (10) depression. (AR 1390-91.) Plaintiff claims that he has the following symptoms: (1) extreme chronic pain; (2) fibro fog; (3) muscle spasms; (4) fatigue; (5) memory loss; (6) muscle pain; (7) joint pain; (8) morning stiffness; (9) joint swelling; and (10) inability to sit or stand for long periods of time. (AR 1391.) The Mayo Clinic and Dr. Fink, Dr. Robb, Dr. Tan, Dr. Horizon, Dr. Lum, and Dr. Lee have well documented that Plaintiff suffers from these diseases to varying degrees. (AR 269, 274, 276-78, 279-80, 282-83, 301-02, 316-17, 320-22, 327-28, 345-46, 353-416, 417-19, 483-87, 492-93, 713, 902, 976, 981-82, 1611-13, 1614.)

CASE NO.: **CV 13-01945 SJO (MRWx)**          DATE: **July 21, 2014**

While the physicians operating on behalf of Defendant provide conflicting evidence regarding these diagnoses (AR 699-701, 2797-806, 2809-13), "[t]he Court notes that inasmuch as any such hierarchy can be established between conflicting opinions of physicians as to a single patient, the Court gives the greatest weight to [Plaintiff's treating physicians], who have spent some amount of time with Plaintiff and assessed [his] symptoms over time." *Rorabaugh v. Continental Cas. Co.*, No. CV 05-03612 SBC, 2006 WL 4384712, at *6 (C.D. Cal. Dec. 8, 2006) (footnote omitted). In *Rorabaugh*, the lower court found the defendant insurance company's reviewing physicians were less credible than the treating physicians, in part because they never personally examined the plaintiff. *Id.* at *6. Given that Defendant's reviewing physicians did not examine Plaintiff and merely confined their reviews to Plaintiff's file, the Court finds that the opinions of Defendant's reviewing physicians should not outweigh the opinions of Plaintiff's treating physicians, all of whom had in-person contact with Plaintiff.[2] "On *de novo* review, a district court may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator." *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003)); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits.").

Plaintiff's primary, and most controversial, diagnosis is fibromyalgia. "Fibromyalgia is a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 796 (9th Cir. 1997) (citing *Fibromyalgia*, Arthritis Foundation Pamphlet, at 1, 5 (1992)). "The depression and anxiety associated with fibromyalgia are believed to be symptoms of this muscular disease, rather than causes of it." *Id.* "Benefits cases involving fibromyalgia are thorny in that the disease's symptoms are difficult to quantify" because "[d]iagnoses necessarily involve subjective determinations as to patients' pain

---

[2] In Plaintiff's Request for Judicial Notice ("RJN"), Plaintiff offers extrinsic evidence outside the Administrative Record regarding the credibility of Defendant's reviewing physicians. (*See generally* Pl.'s RJN, ECF No. 22.) Under the *de novo* standard, the Court may consider evidence that was not before the plan administrator in some circumstances. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995). However, because the Court finds that Plaintiff met his burden of proving total disability from the record alone, the Court does not find circumstances that "clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo*, 46 F.3d at 944 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)); *see also Fleming v. Kemper Nat. Servs., Inc.*, No. C 03-05135 MMC, 2005 WL 839639, at *16 (N.D. Cal. Apr. 11, 2005).

level, often relying largely on the patients' own accounts." *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1108 (C.D. Cal. 2011); *see also Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009) (explaining that there are no laboratory tests to confirm a fibromyalgia diagnosis). "Rheumatology is the relevant specialty for fibromyalgia." *Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (citation omitted).

Plaintiff's diagnosis of fibromyalgia is well documented and is based on criteria created by the American College of Rheumatology. On December 5, 2011, the Mayo Clinic noted that while Plaintiff only registered 3/18 trigger points for fibromyalgia, he met other criteria to support a diagnosis of fibromyalgia, with a widespread pain index of 12/19 and a symptom severity score of 9/12. (AR 345.) On January 19, 2012, Dr. Horizon noted Plaintiff's 14/18 trigger points. (AR 902.) On April 17, 2012, Dr. Lee noted Plaintiff's 12/18 trigger points. (AR 1613.)

Defendant argues that Plaintiff failed to meet his burden of proving that he was totally disabled due to fibromyalgia, in part because he provided no objective evidence of fibromyalgia that would support a total disability finding. (Def.'s Opening Br. 14-16; Def.'s Responding Br. 7-8) Defendant's denial letter stated that because Plaintiff's fibromyalgia is "a functional syndrome without objective findings, there is no basis for [Plaintiff's] physician directed work restrictions or limitations . . . ." (AR 708.) The denial letter further described fibromyalgia as "generally in and of itself not a disabling condition to persons with sedentary or light strength occupations." (AR 710.)

In making this finding, Defendant discounted Plaintiff's subjective reports of pain. *See Abdullah v. Accentcare Long Term Disability Plan*, No. C 09-02909 MMC, 2012 WL 4112291, at *11 (N.D. Cal. Sept. 19, 2012). As in *Abdullah*, "[b]y requiring objective evidence of functional impairment [Defendant] essentially discounted in [its] entirety [Plaintiff's] reports of pain and cognitive symptoms as well as [his] own and [his] treating physicians' assessments of how those symptoms interfered with [his] ability to function . . . ." *Id*. The court in *Abdullah* held that "[g]iven the absence of any evidence to even raise a question as to [the plaintiff's] credibility, and by demanding objective evidence for a disease that eludes such measurement . . . [the insurance company] established what amounted to a threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain." *Id.* (citations and quotations omitted); *see also Lundquist v. Continental Cas. Co.*, 394 F. Supp. 2d. 1230, 1251 (C.D. Cal. 2005) (holding that the defendant insurance company "unreasonably discounted the opinions of [the plaintiff's physicians] on the basis that their opinions were unsupported by any objective medical evidence. . . .").

The Court agrees with the reasoning in *Abdullah* and holds that an insurance company cannot demand objective evidence of fibromyalgia "in the absence of any evidence to even raise a question as to [Plaintiff's] credibility." *Abdullah*, 2012 WL 4112291, at *11. Defendant claims that there is reliable evidence that Plaintiff was not credible. (Def.'s Responding Br. 9.) Defendant repeatedly notes that Plaintiff's primary rheumatologist, Dr. Horizon, ceased treating Plaintiff when

Dr. Horizon could find no disease process that would allow him to continue to complete disability forms for Plaintiff.  (Def.'s Responding Br. 9.)  Defendant also repeatedly notes that Dr. Horizon allegedly described Plaintiff as a "litigious person" during his phone call with Dr. Gavlick.  (Def.'s Responding Br. 9; AR 701.)  However, the Court notes that the contents of the phone call were written in shorthand by Dr. Gavlick.  (AR 701.)  Thus, the context in which Dr. Horizon called Plaintiff "litigious" is unclear.  Furthermore, Defendant has provided no evidence that Plaintiff has been involved in any prior lawsuit.  Most importantly, the Court is not convinced that being "litigious" has any bearing on one's credibility regarding the experience and reporting of debilitating pain.  Thus, the Court gives little weight to Dr. Horizon's alleged statement regarding Plaintiff as being "litigious."

Accordingly, the Court does not require Plaintiff to present objective evidence of fibromyalgia in analyzing whether Plaintiff is totally disabled under the Policy, and takes into account Plaintiff's subjective reports of his illnesses.  As discussed, Plaintiff's subjective reports and the opinions of Plaintiff's treating physicians strongly support a diagnosis of fibromyalgia.

   2.  <u>Plaintiff's Own Occupation</u>

In determining whether Plaintiff was and still is "totally disabled" under the Policy, the Court looks to the amended 2010 language of "own occupation," "total disability," and "material and substantial acts."  (*See* AR 50-57.)  The Court, in its *de novo* review, first looks at Plaintiff's specific duties required by his employer, City National Bank.  If Plaintiff is unable to perform one or more of those duties with reasonable continuity, the Court must determine whether those duties are customarily required of other employees engaged in his own occupation.  (Pl.'s Opening Br. 11; AR 50-57.)

Plaintiff had the following duties as a Senior Vice President/Leader of the Entertainment Group: (1) sales management; (2) staff management; (3) portfolio management; and (4) credit quality and compliance.  (AR 223-25.)  More specifically, the job description provides:

> The Team Leader Entertainment [sic] is responsible for managing a team of Relationship Managers and sales support staff in addition to managing the profitability and risk of an assigned portfolio. Responsible for managing and professionally developing relationship managers with an emphasis on sales [] growth, portfolio growth and cross selling.  Provides leadership and guidance to a team in the attainment of profitable relationships and high levels of performance. Responsible for assigned portfolio; developing business opportunities and maintaining a profitable portfolio by building relationship with prospects and customers consistent with the objectives of the bank. This person will actively work with other areas of [City National Bank] as well as with other Entertainment colleagues to deliver exemplary service for clients.

(AR 223.) Plaintiff reiterates that he was responsible for managing a team of managers and sales support staff, in addition to managing the profitability and risk of a sizeable portfolio that generated ten million dollars in annual profits for City National Bank. (AR 1490.)

In analyzing whether Plaintiff could perform his own occupation, Defendant and its reviewing physicians reasoned that Plaintiff's own occupation was sedentary and that since in their opinion Plaintiff could sit and do other physical activities consistent with a sedentary job, he therefore could perform the material and substantial acts of his own occupation. (AR 705-11; 2791-92.) For example, after performing a Dictionary of Occupational Titles ("DOT") lookup and reviewing Plaintiff's job description, Defendant decided that Plaintiff's job correlated to two occupations: (1) "Sales Manager" with a Physical Demand Level ("PDL") of "sedentary"; and (2) "Sales Representative, Financial" with a PDL of "light." (AR 168.) Defendant concluded that Plaintiff's "occupation holds a sedentary to light physical demand level in the national economy." (AR 168.)

However, nowhere in the Policy does it provide that Plaintiff's own occupation for any employer would be determined by that occupation's PDL, nor does the Policy mention the word "sedentary." In *Sabatino v. Liberty Life Assurance Co. of Boston*, the Northern District of California questioned the classification of the plaintiff's engineer profession as "sedentary":

> The crux of Plaintiff's claim for disability benefits is severe and chronic pain and the cognitive impairments caused by the pain medications she must take to manage this pain. Plaintiff was employed as an engineer, which may be a sedentary occupation, but one that requires careful thought and concentration. **Simply being able to perform sedentary work does not necessarily enable one to work as an engineer.**

286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) (emphasis added).

The Court declines to simply categorize Plaintiff's "own occupation" as sedentary and engage in a narrow analysis of whether Plaintiff could perform sedentary work. *See Rorabaugh*, 2006 WL 4384712, at *4 ("Instead of inquiring whether [the plaintiff] could perform 'her occupation' (the applicable standard under the Policy), [the defendant insurance company] asked [its reviewing doctor] to determine whether [the plaintiff's] 'functionality' was at the 'heavy, medium, light, or sedentary' level.")

Because of his conditions, Plaintiff stated to Defendant that he could not perform the material and substantial acts of his own occupation for a number of reasons. Plaintiff experiences fatigue and pain regularly, sometimes so much that he is barely able to get out of bed. (AR 1393.) Thus, he claims that he cannot work the required eight hours a day, five days a week, much less the extended hours necessary to successfully perform his own occupation. (AR 1393.) He sometimes had to be in the office for fourteen hours in one day, but because of his condition he faded out by

one or two in the afternoon. (AR1393-94.) Later in the day, he could not respond to client emails in a coherent fashion. (AR 1394.) Plaintiff had difficulty concentrating and remembering details, so when he could not remember a specific client's circumstances, he could not provide the information required of him. (AR 1393.) Plaintiff claimed that the symptoms are aggravated by stress and his job is extremely high stress. (AR 1394.) Plaintiff also explained that he could not perform his job duties because of the pain, brain fog, and fatigue, and as his symptoms got worse, his job demands stayed the same. (AR 1394.) Plaintiff also has chronic lower back pain in both buttocks which worsens when he stands, walks or sits for prolonged periods of time. (AR 1394.) Because he cannot sit for prolonged periods of time, he could not sit through long management meetings that he was required to attend. (AR 1394.)

After a thorough review of the Administrative Record, the Court finds that Plaintiff has provided sufficient evidence to suggest that he cannot perform his own occupation, even in a "sedentary" fashion. However, even assuming Plaintiff could perform sedentary work, Plaintiff has many other intellectual responsibilities that require both financial expertise as well as a high level of interpersonal skills. The Court does not decide whether fibromyalgia by itself is disabling, but rather finds that Plaintiff has provided sufficient medical evidence that all of his conditions, taken together, cause significant pain and mental impairment that prevents Plaintiff from meeting the requirements of his own occupation.

Defendant argues that Dr. Gavlick, Dr. Swotinsky, and Dr. Burstein's opinions that Plaintiff was not totally disabled were in line with Plaintiff's own rheumatologists, Dr. Horizon and Dr. Lee. Defendant claims that Dr. Horizon and Dr. Lee never opined that Plaintiff was disabled, despite noting trigger points. (Def.'s Responding Br. 8.) However, the Court finds this statement to be inaccurate. On the first page of Dr. Horizon's APS signed on March 5, 2012, he stated that Plaintiff "**will need to be absent from work due to a disability** beginning" on July 7, 2011 and ending on "present."[3] (AR 418.) Furthermore, Plaintiff's treating physicians, Dr. Tan and Dr. Lum, both filled out APS forms attesting to Plaintiff's inability to work. (AR 301-02, 316-17.) Taken together, the Court finds the three APS forms to be highly persuasive evidence of Plaintiff's total disability.

---

[3] The term "present" is somewhat ambiguous as on the next page of the APS, Dr. Horizon estimated Plaintiff's return to work date to be December 30, 2012. (AR 417-18.) On the same page, Dr. Horizon listed a number of work restrictions for Plaintiff including that he could only work **four hours per day and three days per week**. (AR 418.) Thus, it appears that Dr. Horizon's work restrictions would take effect after March 5, 2012, until the estimated return date of December 30, 2012. Dr. Horizon's APS provides evidence that Plaintiff was totally disabled at least until March 5, 2012, with significant restrictions afterwards.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: CV 13-01945 SJO (MRWx)          DATE: July 21, 2014

A finding of total disability is buttressed by Plaintiff's required working hours. He was required to be in the office for at least eight hours, and sometimes up to fourteen hours per day. (AR 1393-94.) Plaintiff claims that he could not perform at a high level for the required hours. In their APS forms, neither Dr. Tan, Dr. Horizon, nor Dr. Lum cleared Plaintiff for working even eight hours. (AR 301-02, 316-17, 417-19.) In *Garrison v. Aetna Life Ins. Co.*, the Eastern District of California held that the defendant insurance company abused its discretion in determining that the plaintiff could work at her own occupation, in part, because the insurer "failed to consider and did not even refer to the discrepancy between [the plaintiff's] usual hours and the eight hour restriction placed on [the plaintiff's] work day." 558 F. Supp. 2d 995, 1006 (C.D. Cal. 2008). That court emphasized that the insurer "simply noted that [the plaintiff] could work in a 'sedentary physical demand level' for an eight hour day based on the [medical evidence], and summarily concluded that [the plaintiff]'s medical condition would not prevent her from performing her own occupation." *Id.*; *see also Rosenthal v. Long-Term Disability Plan of Epstein, Becker & Green, P.C.*, No. CV 98-04246 GAF, 1999 WL 1567863, at *8-11 (C.D. Cal. Dec. 21, 1999) (finding an abuse of discretion where administrator terminated LTD benefits where the plaintiff could work 40 hours per week, but where her own occupation as a trial attorney required her to work 40-70 hours per week); *Faulkner v. Hartford Life & Acc. Ins. Co.*, 860 F. Supp. 2d 1127, 1144 (E.D. Cal. 2012) (finding an abuse of discretion where the administrator terminated LTD benefits because none of the plaintiff's doctors cleared her for the 40 hour work week that was required of her own occupation). Thus, in the present case, even assuming Plaintiff could perform sedentary work in the national economy, he would be unable to perform such sedentary work for the number of hours required of his occupation.

Defendant argues that despite Plaintiff's subjective complaints of pain, Plaintiff's ability to exercise is well-documented in the Administrative Record. (Def.'s Responding Br. 9.) Defendant points to a note in Plaintiff's file stating that Plaintiff "was asked to leave the bank in the Spring of 2011, ostensibly because he was missing work due to self-care activities such as exercise." (AR 2797; Def.'s Responding Br. 9.) Defendant appears to argue that Plaintiff is malingering because he was capable of jogging three miles. (AR 700, 2805-06; Def.'s Responding Br. 9.) However, Plaintiff claims that "[h]e tries to move around as much as possible so that his muscles keep moving, but it is painful." (AR 1392.) This is consistent with Dr. Robb's statement that Plaintiff's symptoms are "relieved by walking briskly [and] jogging . . . ." (AR 321.) Such exercise does not mean that Plaintiff is able to perform his own occupation. After all, it is Plaintiff's inability to sit or stand for long periods of time that is made difficult because of fibromyalgia and other diseases—functionality required of Plaintiff in his own occupation. Furthermore, as indicated by Dr. Tan and Dr. Lum, Plaintiff appears motivated to return to work (AR 302, 317), which is consistent with his effort to exercise and lose weight. Plaintiff's motivation to return to work is laudable and weighs against any kind of finding of malingering based on Plaintiff's efforts to exercise. Accordingly, the Court finds that Plaintiff has established, by the preponderance of the evidence, that he was totally disabled under the Policy.

   3.  <u>SSA Disability</u>

The Court's analysis is further supported by the SSA's disability finding for Plaintiff. Although the disability standards used by the SSA and the Policy are different,[4] Plaintiff's entitlement to SSD benefits still suggests that he suffers from some limitation on his ability to work. Thus, "although this award does not constitute direct proof, it reinforces [Plaintiff's] showing that [he] had a disability that could qualify [him] for benefits under [the Policy]." *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1164-65 (N.D. Cal. 2010).

> 4. Time Period of Plaintiff's Total Disability

The Policy provides that a claimant's disability ends on "[t]he date that [the claimant fails] to give proof that [the claimant is] still disabled." (AR 52.) The Court finds that Plaintiff established that he was "totally disabled" under the Policy for the 180-day waiting period between July 17, 2011, and January 12, 2012. However, the latest indication from the Administrative Record that Plaintiff was disabled is April 30, 2012, when Dr. Lum informed Defendant that Plaintiff was disabled and unable to work. (AR 713.) Given that the Court is restricted to the Administrative Record, Court is unable to determine whether Plaintiff was totally disabled after April 30, 2012.

Thus, while the Court finds that Defendant incorrectly denied Plaintiff his LTD benefits, Plaintiff has met his burden of proving that he was totally disabled only between July 16, 2011, and April 30, 2012. The Court must remand to Defendant to decide whether Plaintiff was totally disabled between April 30, 2012, and January 11, 2014, and if so, whether he was totally disabled thereafter under the "any occupation" standard set forth in the Policy. *See Nash v. Life Ins. Co. of N. Am.*, No. CV 08-00893 WQH, 2010 WL 5139087, at *35 (S.D. Cal. Dec. 9, 2010) (ordering retroactive disability benefits, but remanding to the defendant insurance company to decide whether plaintiff was entitled to benefits under the "any occupation" standard because (1) the defendant had not decided the plaintiff's claim under that standard, (2) the administrative record was not adequately developed on the issue, and (3) the court was not the proper forum to consider the issue in the first instance).

///

///

> B. Judicial Estoppel

In addition to Plaintiff's case on the merits, Plaintiff argues that Defendant is judicially estopped from asserting that Plaintiff is not totally disabled because "in the SSA proceedings [Plaintiff and Defendant] established that [Plaintiff] cannot perform any job in the national economy." (Pl.'s

---

[4] For SSD benefit determinations, the claimant's condition is measured against a uniform set of federal criteria, whereas a disability determination under an ERISA plan usually turns on the interpretation of the plan's terms. *See Black & Decker*, 538 U.S. at 833.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 13-01945 SJO (MRWx)          DATE: July 21, 2014

Opening Br. 18.) Judicial estoppel is an equitable doctrine invoked by a court at its discretion "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks and citations omitted). Judicial estoppel prevents "a party from gaining an advantage by asserting one position . . . and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (internal citations omitted).

However, the Court in not convinced that judicial estoppel applies in this case. Defendant was not a party in the SSA proceedings and thus did not make any representations in that proceeding at all. (*See* Def.'s Responding Br. 18.) Furthermore, courts have rejected applying judicial estoppel to a defendant in an ERISA case to prevent that defendant from arguing that a claimant is not totally disabled merely because of an SSA disability determination, even when the defendant encourages the plaintiff to apply for SSD benefits. *See Smith v. Hartford Life & Acc.*, No. C 11-03495 LB, 2013 WL 394185, at *26 (N.D. Cal. Jan. 30, 2013); *Moskowite v. Everen Capital Corp.*, No. C 03-04666 MMC, 2005 WL 1910941, at *4 (N.D. Cal. Aug. 10, 2005).

III.     RULING

The Court finds that under *de novo* review, Plaintiff established, by the preponderance of the evidence, that he was "totally disabled" under the Policy between January 11, 2012, and at least April 25, 2012. Thus, the Court awards Plaintiff retroactive LTD benefits from January 12, 2012, through April 30, 2012. The Court further remands to Defendant to decide whether Plaintiff was totally disabled under the "own occupation" standard from May 1, 2012, to January 10, 2014, and if so, whether he was totally disabled thereafter under the "any occupation" standard. Plaintiff shall have until **July 14, 2014**, to submit a proposed judgment in accordance with this order.

IT IS SO ORDERED.